IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

YAMIL VALENTIN GONZALEZ,

Plaintiff,

v.

JOHNSON AND JOHNSON SERVICES,
INC., et al.,

Defendants.

CIVIL NO. 12-1159 (CVR)

## OPINION AND ORDER

## INTRODUCTION

Plaintiff Yamil Valentín (hereinafter "Plaintiff" or "Valentín") brings this suit alleging discrimination on the basis of religion, violation of a reasonable accommodation agreement, and retaliation for having made internal complaints under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12201, *et. seq*., and Puerto Rico Act No. 100 of June 30, 1959, and Act No. 115 of December 20, 1991, P.R. Laws Ann., tit. 29 §146-151, and for damages flowing therefrom under Puerto Rico Civil Code Articles 1802 and 1803, P.R. Laws Ann., tit. 31 § 5141 & 5142. The original Defendants were Johnson-Johnson Services, Inc.; Janssen Cilag Mfg., LLC; Janssen Ortho, LLC; Jorge Pantoja, his wife Jane Doe, and their conjugal partnership; Gilberto Pagán, his wife Jane Doe, and their conjugal partnership, and an unknown company.

On October 6, 2014, the Court dismissed all claims against Jorge Pantoja, his wife, the Pantoja-Doe conjugal partnership, Gilberto Pagán, his wife, the Pagán-Doe conjugal partnership, and XYZ Insurance Company, for failure to timely serve with process (Docket

No. 15).  The remaining Defendants are Johnson-Johnson Services, Inc., Janssen Cilag Mfg., LLC and Janssen-Ortho, LLC (collectively, "Defendants").

Before the Court now is Defendants' Motion for Summary Judgment (Docket No. 28); Plaintiff's opposition thereto (Docket No. 37); Defendants' reply to Plaintiff's opposition (Docket No. 44); and Plaintiff's sur-reply (Docket No. 51).

In Defendants' motion, they petition the Court to grant summary disposition of all of Plaintiff's claims.  Regarding the claims brought under the ADA, Defendants proffer that they cannot lie because, since Plaintiff is not a qualified individual with a disability, he cannot establish a failure to accommodate claim.  Defendants further posit that, even if Plaintiff was considered disabled, they were not obliged to provide him the specific accommodation he requested, only a reasonable one to accommodate his needs, which was done.  As to the retaliation claim, Defendants aver that no *prima facie* case can lie, as the temporal nexus between the adverse employment action and the protected activity is too remote, and there is no causal connection between them.  Even if a causal connection was established, Defendants have proffered a legitimate reason for their decision to transfer Plaintiff to the first shift of the Packaging Department, to wit, Plaintiff's own request in order to continue his medical treatment.  Finally, regarding the religious discrimination claim, Defendant contend that most of the comments relied upon for the claim are too remote from the alleged decision in question to be considered, and further, they were made by persons who were not the decision makers and thus, should not be considered.

<u>Yamil Valentín González v. Johnson and Johnson Services, Inc., et al</u>
Civil No. 12-1159 (CVR)
Opinion and Order
Page 3

As to the state law claims, Defendants argue they should also be dismissed if the Court dismisses the federal claims, as the state law claims mirror their federal counterparts. Finally, Defendants contend that all claims against Johnson and Johnson Business Services (incorrectly named in the Complaint Johnson and Johnson Services, Inc.), and Janssen Cilag Mfg, LLC should be dismissed, as Plaintiff did not have any type of employment relationship with either entity.

Plaintiff counters, saying that his depressive disorder is a disability and that the reasonable accommodation offered to Plaintiff should be evaluated looking at the totality of circumstances. Regarding retaliation, Plaintiff proffers he suffered an adverse action because the transfer to the Packaging Department was a demotion and because temporal proximity exists between his complaints and the transfer.   Finally, regarding the religious discrimination claims, Plaintiff alleges the comments uttered in the past can serve as background to support his present claims and the denial of the positions and subsequent transfer to the Packaging Department were because of his religion.

For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c).  Pursuant to the language of the rule, the moving

party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also, Colón v. Infotech Aerospace Services, Inc., 869 F.Supp.2d 220, 225-226 (D. Puerto Rico 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the

movant and the party opposing summary judgment.   A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted."   Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226. Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."   Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

At the outset, the Court notes that Plaintiff's opposing statement of material facts duplicated many of Defendants' proffered facts.  Just because the same fact is offered with different wording does not automatically make it different.  Therefore, where two (2) versions of the same fact were offered by both parties, the Court only accepted one (1) submission.  Furthermore, and in accordance with the Local Rules cited above, the Court did not accept submissions with incorrect citations that could not easily be identified by the Court, or submissions with citations to missing pages in the record.

With this in mind, and pursuant to the parties' submissions, the Court deems the following facts uncontested.

<u>Yamil Valentín González v. Johnson and Johnson Services, Inc., et al</u>
Civil No. 12-1159 (CVR)
Opinion and Order
Page 6

1.    Plaintiff began working for McNeil Pharmaceutical in Dorado (hereinafter "McNeil-Dorado"), on May 12, 1997 as a regular employee in the position of Process Operator ("Operador de Procesos"). (P. Exhibit 1, Exhibit 2 to deposition).

2.    In his employment application, Valentín informed McNeil-Dorado that he could not work on Saturdays due to religious beliefs. (D. Exhibit A P.32, L.20-25; P.33, L.1-3).

3.    Valentín is an Adventist. (Docket No. 1 ¶13).

4.    When Plaintiff began to work at McNeil-Dorado, he received the Johnson and Johnson Family of Companies Employee Handbook. (D. Exhibit A P.34, L15-18).

5.    When Plaintiff began to work at McNeil-Dorado he was assigned to the first shift, from 6:30 a.m. to 3:00 p.m., from Monday through Friday, which did not interfere with his religious observances. (D. Exhibit A P.36, L.10-25).

6.    On October 25, 2000, Valentín was notified that the McNeil operations in Dorado were closing in December 2000 and that he would be dismissed. (D. Exhibit A P.39, L.6-13, D. Exhibit B).

7.    Prior to leaving McNeil-Dorado, Valentín sought and was offered employment at Janssen-Gurabo, to begin in 2001. (D. Exhibit A P.40, L.9-25; P.41, L.1-4).

8.      At Janssen-Gurabo, Valentín was offered the position of Manufacturing Operator, with a salary rate of $12.32 per hour. (D. Exhibit A P.42, L.7-12).

9.      When Valentín began to work at Janssen-Gurabo, he completed an employment application and indicated that he was available to work on Holidays and Sundays, but not on Saturdays. (D. Exhibit A P.43, L.13-25; P.44, L.1-4).

10.     When Valentín began his employment with Janssen-Gurabo, he received the Employee Handbook. (D. Exhibit A P.44, L.13-16).

11.     When Valentín began working at Janssen-Gurabo in 2001, he discussed with a supervisor and a Human Resources official two restrictions due to his religious beliefs:   a) not to perform work from sundown on Friday to sundown on Saturday; and b) that he could not come into contact with the product Pancrease.  Such requests were accommodated. (D. Exhibit A P.46, L.7-25, P.47, L.1-25, P.48, L.1-16).

12.     At Janssen-Gurabo, Valentín was supervised by Jorge Pantoja (hereinafter "Pantoja"). (D. Exhibit A P.49, L.10-14).

13.     At Janssen-Gurabo, supervisors and other personnel could nominate other employees for recognitions in excellence, where the winner received a monetary award. (D. Exhibit A P.49, L.15-25).

14.     Plaintiff was nominated for such prizes, but he does not have knowledge of who nominated him while at Janssen-Gurabo. (D. Exhibit A P.50, L.1-9).

15.     Three years after starting to work at Janssen-Gurabo, Valentín applied for a position in Ortho Pharmaceutical in Manatí (hereafter "Ortho-Manatí") because he did not like living in Juncos, and preferred to go back to Manatí. (D. Exhibit A P.52, L.3-24).

16.     On December 28, 2004, Valentín was offered the position of Senior Process Technician II in the third shift at Ortho-Manatí, beginning January 3, 2004. (D. Exhibit A P.53, L.8-15).

17.     His salary at Ortho-Manatí was $14.17 per hour. (D. Exhibit A P.54, L.19-23.)

18.     Valentín worked at Ortho-Manatí for two months and, in March 2005, he requested to go back to Janssen-Gurabo. Valentín's request was granted and he returned to Janssen-Gurabo on March 14, 2005. (D. Exhibit A P.55, L.15-23).

19.     When Valentín returned to Janssen-Gurabo in March, 2005, his salary was $15.53 per hour; this is more than what he had previously at Gurabo, but the same as he had in Manatí. (D. Exhibit A P.58, L.2-11).

20.     In November 23, 2005, Valentín applied for, and obtained, a position at Ortho-Manatí as a Technician III TA at a rate of $17.95 per hour; he thus returned to Ortho-Manatí. (D. Exhibit A P.55, L.19-25; P.56, L.1-4; L.12-16; P.58, L.25; P.59, L.1-11).

21.     When Valentín returned to Ortho-Manatí in 2005, he received the Ortho-Manatí's Rules of Conduct. (D. Exhibit A P.59, L.19-25; P.60, L.1).

22. On July 10, 2008, Valentín was notified that Ortho-Manatí's policies were moved to an internet portal.  If Valentín could not access such policies using the Internet, the Human Resources Department would give him a print out of the policy he requested. (D. Exhibit A P.60, L.2-25; P.61, L.1-19).

23. In 2008, Plaintiff used FMLA leave due to his daughter's serious health condition. (D. Exhibit A P.62, L. 2-8).

24. During the summer of 2010, Plaintiff applied for the positions of Tooling Technician and Process Technician I at Janssen-Gurabo. (D. Exhibit A P.65, L.7-14).

25. Plaintiff applied for these positions because Ortho-Manatí was going through a restructuring, and he believed he would be dismissed due to the restructuring. (D. Exhibit A P.66, L.4-22).

26. Gilberto Pagán (hereafter "Pagán") and another individual interviewed Plaintiff for the position of Tooling Technician. (D. Exhibit A P.70, L.9-25).

27. Pagán is an Adventist, as is Valentín. (D. Exhibit C P.58, L.13-18).

28. Pagán had never supervised Valentín. (D. Exhibit C P.71, L.1-5).

29. In the interview Plaintiff was asked if he could work on Saturdays and he replied he could not because he was Adventist.  (P. Exhibit 5, P. 57, L.1-9).

30. Plaintiff was not given the position of Tooling Technician. (Exhibit A P.71, L.15-16). Plaintiff does not know who made the hiring decision for the Tooling Technician position. (D. Exhibit A P.71, L.17-21).

31.     Plaintiff also applied for the position of Process Technician I in the third shift. This was a lower salary position. (D. Exhibit A P.72, L.23-24; P.73, L.1-6. L.19-23; L.14-20, P. 75, L. 15-23).

32.     Plaintiff was interviewed for the position of Process Technician I via telephone by Pantoja, who had been his supervisor at Janssen-Gurabo. (D. Exhibit A P.73, L.23-25; P.74, L.1-4).

33.     During the interview for Process Technician I, Plaintiff was asked if he was available for the first, second or third shifts, and Plaintiff responded that he was available. (D. Exhibit A P.75, L.5-10). Plaintiff was not offered this position. (D. Exhibit A P.75, L.21-23).

34.     The Tooling Technician I position was given to a temporary employee and the other position to an outside applicant. (P. Exhibit 1, P. 71, L. 24-25).

35.     Human Resources informed employees of Johnson & Johnson that they were to be given priority in the selection and recruitment for positions. (P. Exhibit 1, P. 85, L. 8-25, P. 86, L.1-6).

36.     Process Technician I position was awarded to Rafael Gónzalez, who was trained by Valentín at both the Dorado and Manatí plants. (P. Exhibit 1, P. 82, L. 9-12).

Plaintiff's First Internal Complaint: September 2010

37.     María Ojeda (hereinafter "Ojeda") is the Director of Human Resources for Janssen-Gurabo and Ortho-Manatí. (D. Exhibit A P.126, L.3-8).

38. The Company has an open door policy where an employee can go to his or her supervisor, manager, director, General Manager or Human Resources as well as use a Hotline, to express any concerns. (D. Exhibit D P.23, L.4-14).

39. In the investigation of complaints, the standard procedure is that the Company interviews the employee and other relevant persons, gathers information and then acts accordingly. (D. Exhibit D pp.23-24). There is no written manual. Id.

40. The Human Resources manager at Gurabo in September 2010 was Blanca Hernández. (D. Exhibit D P.27, L.25).

41. The Human Resources manager at Manatí in September 2010 was Iris Torres (hereinafter "Torres"). (Exhibit D P.27, L.22-23).

42. On or around September, 2010, after the selection process for the Process Technician I and the Tooling Technician positions had ended, Plaintiff requested a meeting with Torres, from the Human Resources Department at Ortho-Manatí. Torres and Plaintiff met as requested. (D. Exhibit A P.80, L.23-25; P.81, L.1-13).

43. Plaintiff wanted to meet with Torres to discuss the selection process. Plaintiff thought he was qualified and he had allegedly trained Rafael González, the person selected for one of the positions. Also, Plaintiff thought Pantoja had some sort of prior prejudice against Plaintiff due to alleged discriminatory comments in the past. (D. Exhibit A P.82, 1-18).

44.  During the investigation, Plaintiff alleged that in 1996, 14 years before, while Plaintiff was a temporary employee in McNeil-Dorado, his supervisor at the time, Carlos Irrizary (hereinafter "Irizarry"), required him to work Saturdays and Sundays, and asked Plaintiff if he was sure that he could not work on Saturdays because Irizarry had worked with other Adventists in the past and had to "remove" them. (D. Exhibit A P.91, L.6-16). Plaintiff alleged that Irizarry asked him if he was sure that he was not able to work on Saturdays because if so, he would have to fire him. (D. Exhibit A P. 107, 11-22). Irizarry allegedly called Torres and told her that they could not hire Adventists because he needed employees that were able work on Saturdays and Sundays. (D. Exhibit A P.107, L.23-25; P.108, L.1-5).

45.  In November 1996 and while still in McNeil-Dorado, Plaintiff alleged that Eric Díaz, a co-worker, told him that Irizarry wanted to fire him. (D. Exhibit A P.108, L.23-25; P.109, L.1-15).  Plaintiff also alleged that in 1998 or 1999 his supervisor, José Hernández, allegedly told Plaintiff that he had to work from 5:00 a.m. to 5:00 p.m. from Monday through Friday or Saturdays and Sundays. (D. Exhibit A P.111, L.4-12).

46.  Plaintiff also alleged that three years later, around 1999, José Hernández wrote Bible verses in a blackboard because Plaintiff was an Adventist. (D. Exhibit A P.111, L.13-25, P.112, L.1-12.).  This was eleven years before the 2010 investigation.

47.     Plaintiff also alleged that, on one occasion before 2000, in McNeil-Dorado, José Hernández allegedly screamed at Plaintiff about the need for him to work on Saturdays and Sundays. (D. Exhibit A P.112, L.22-25; P. 113, L.1-12). Plaintiff reported this incident to the Human Resources Department at the time. (D. Exhibit A P.113, L.13-20.).  Plaintiff did not have any more contact with José Hernández until 2007. (D. Exhibit A P.113, L.21-23).

48.     In 2002 or 2003, Pantoja allegedly asked Plaintiff how he could play baseball on Saturdays but not work and Plaintiff allegedly responded that he played baseball after sundown. (D. Exhibit A P.114, L.4-24).

49.     Plaintiff alleged that in 2003 or 2004, six or seven years before, Pantoja allegedly told Plaintiff "come here, if you are an Adventist, how do you observe Saturdays in Alaska if six months of the year it is daytime and six months it is nighttime? Tell your Pastor you are in Alaska so he can give you a release." (D. Exhibit A P.94, L.5-15; P.115, L.21-25; P.116, L.1-10).

50.     Plaintiff never reported these comments to Human Resources. (D. Exhibit A P.117, L.5-7).

51.     Plaintiff alleged that, at some point prior to 2005, Pantoja asked Plaintiff to obtain a special permit from his pastor in order to work on Saturday. (D. Exhibit A P.115, L.13-16; P.115, L.17-20).

52.     Plaintiff told Torres that he was afraid of losing his job in Ortho-Manatí. (D. Exhibit A P.96, L.3-5).

53. Plaintiff asked Torres to conduct an investigation because he understood that he was qualified for the positions of Tooling Technician and Process Technician I that he had applied for in Janssen-Gurabo. (D. Exhibit A P.96, L.11-15).

54. After Plaintiff spoke to Torres, in September 2010, he made a call to the Hotline to file a complaint. (D. Exhibit A P.97, L.19-25; P.98, L.1-4).

55. Plaintiff called the Hotline to complain of discrimination due to religion, and because he was not selected for one of the two positions he had applied for at Janssen-Gurabo. (D. Exhibit A P.100, L.8-13).

56. As part of the Hotline complaint, Plaintiff discussed the incident with Irizarry. (D. Exhibit A P.106, L.16-25; P.107, L.1-25; P.108, L.1-21).

57. During the Hotline call, Plaintiff told the interviewer, among other things, that he was not selected for the position of Tooling Technician. (D. Exhibit A P.120, L.16-25; P.121, L.1-6).

58. Plaintiff also told the interviewer that Pantoja and José Hernandez had violated Company policy against discrimination on the basis of religion. (D. Exhibit A P.121, L.7-9; P.122, L.20-25; P.123, L.1-7).

59. Plaintiff understood that these individuals' conduct did not result in any adverse consequences to them and felt the call was necessary because he felt that people from outside the plants could me more impartial and effective. (D. Exhibit A P.100, L. 107; P. 123, L.20-23).

60.     The next day, Plaintiff told Torres that he had called the Hotline. (D. Exhibit A P.99, L. 15-23).

61.     After Plaintiff told Torres that he had called the Hotline, a meeting between Plaintiff, Ojeda and Torres took place. (D. Exhibit A P.125, L.20-25; P.126, L.1-2).

62.     During the meeting between Ojeda, Torres and Plaintiff, Ojeda asked Plaintiff to give her an opportunity to conduct an investigation regarding these allegations, and told him that Mariola Feliciano (hereinafter "Feliciano"), from Employee Relations, would conduct the investigation, pursuant to his hotline call. (D. Exhibit A P.126, L.25; P.127, L.1-13).

63.     Feliciano met with Plaintiff. (D. Exhibit A P.128, L.3-7).

64.     During this investigation, Plaintiff did not complain about Pagán, who had interviewed him for the position of Tooling Technician. (D. Exhibit A P.145, L.17-24).

65.     Valentín called Feliciano and told her that he was going to file a complaint with the EEOC. (P. Exhibit 1, P. 129, L. 17-25).

66.     Feliciano told Valentín that Torres had a response for him, and that Feliciano could not tell him. (P. Exhibit 1, P. 129, L. 17-25).

67.     From October 11, 2010, and until November 12, 2010, Plaintiff was hospitalized at the First Hospital Panamericano. (D. Exhibit A, P.148, L.1-25).

68.  As part of the treatment received by him at the Hospital Panamericano, Plaintiff stated that the labor aspect played an essential role as a stressor affecting his health condition. (P. Exhibit 6).

69.  After the hospitalization, Plaintiff began to see Dr. Parra, a psychiatrist, who recommended that Plaintiff remain in the first or second shift in order to continue treatment. (D. Exhibit A P.149, L.5-14).  Dr. Parra recommended that Plaintiff not work at night. (D. Exhibit A P.159, L.15-20). The recommendation was only related to work schedule or shifts. (D. Exhibit A P.160, L.1-3).

70.  After Dr. Parra issued the above recommendation, Plaintiff remained in his shift from 9:00 a.m. to 5:30 p.m. on Fridays, and the second shift from 2:00 p.m. to 10:30 p.m. the rest of the work week, as before his hospitalization. (D. Exhibit A P.152, P.3-17; P.154, L.10-25; D. Exhibit E and D Exhibit F.)

Outcome of the Investigation

71.  As part of the investigation, the Company addressed Plaintiff's complaint concerning the denial of the Process Technician I and Tooling Technician positions for which he had applied. It concluded that Plaintiff was not the most qualified individual for the position of Tooling Technician. It also concluded that Plaintiff was qualified for the position of Process Technician I, and an individual with equal or less experience than Plaintiff's was hired. (D. Exhibit D P.30, L.15-25; Exhibit G).

72. The Company took corrective measures and offered Plaintiff a Process Technician I position at Janssen-Gurabo which became available during the course of the investigation. (Exhibit D P.31, L.15-25; P.32, L.1-9; P.97, L.12-19; D. Exhibit H and D. Exhibit G).

Plaintiff's Return to Janssen in Gurabo

73. On December 17, 2010, Plaintiff was offered the position of Process Technician I in the third shift beginning in January 2011 , a position he had applied for in the summer of 2010 in Janssen-Gurabo (D. Exhibit A P.130, L.23-25; P.131, L.1-11; D. Exhibit H).

74. The salary for the Process Technician I position was $16.44 per hour. (D. Exhibit A P.134, L.6-15; D. Exhibit H).

75. On December 17, 2010, Plaintiff was also sent a letter stating that, if he accepted the offer for the Process Technician I position, he would be promoted to Process Technician II in March 2011 at a rate of $19.71 per hour. (D. Exhibit A P.134, 24-25; P.135, L.1-5, D. Exhibit H).

76. Valentín objected this offer, because it affected his seniority at the Company, but nevertheless accepted it. (P. Exhibit 1, P. 131, L. 14-21).

77. After Plaintiff was offered the position of Process Technician I at Janssen-Gurabo, he began a three-week vacation leave. (D. Exhibit A P.143, L.2-13; P.155, L.4-9).

78. Plaintiff began to work at Janssen-Gurabo, on January 10, 2011 and was moved to the first shift on January 17, 2011, from 6:00 a.m. to 2:30 p.m. (Exhibit A P.161, L.7-13). This work schedule complied with Dr. Parra's recommendation. (D. Exhibit A P.163, L.13-17, P.203, L.20-25; 204, L.1-14).

79. When Plaintiff returned in 2011 to Janssen-Gurabo the Human Resources office had knowledge of his accommodation, because Torres and Ojeda both knew about it. (D. Exhibit A, P. 156, L. 6-11).

80. Defendants share the same Human Resource Department. (P. Exhibit 3, P. 40, L. 16-22; P. Exhibit 4, P. 49, L. 10-15).

81. When Valentín arrived at Janssen in January, 2011, Ms. Niurca, his first contact with a Human Resources officer, informed him that he would have to work in the third shift, even when he had a first shift accommodation. Also, Ms. Niurca jointly with the Supervisor of duty, when preparing the schedule for the following week, placed Valentín in the third shift. (D. Exhibit A, P. 206, L. 13-25; P. Exhibit 1, P. 207 L. 1-18).

82. In January 2011, when Plaintiff began to work at Janssen-Gurabo, he received the information on how to access the Human Resources policies and the Employment Handbook. (D. Exhibit A P.143, L.14-20; and D. Exhibits I, J, and K).

83. During the first month that Plaintiff was in the Process Technician I position in Janssen-Gurabo, he was also paid an additional compensation for mileage. (D. Exhibit A P.140, L.24-25).

84. During the second month Plaintiff was in the Process Technician I position in Janssen-Gurabo he was hospitalized again, and was not paid mileage during that time because he did not have to drive to work. (D. Exhibit A P.141, L.6-8; P.142, L.5-10).

Performance Evaluations

85. In 2005, while at Ortho-Manatí, Plaintiff received a score of "7" in his performance evaluation. (D. Exhibit A P.170, L.12-23.) A "7" means "consistently exceeds the position standards." (D. Exhibit L).

86. In 2007, while at Ortho-Manatí, Plaintiff received a score of "7" in his performance evaluation, which means "consistently exceeds the position standards." (D. Exhibit M.) José Hernández was the supervisor who signed the 2007 performance evaluation. (D. Exhibit A P.171, L.11-20).

87. In 2009, while at Ortho-Manatí, Plaintiff received a "5" in his performance evaluation, his supervisor was Luis A. Vega. A "5" means "performance that consistently complies and occasionally exceeds the standards of the position." In a written request for a reconsideration of his evaluation score, Plaintiff never mentioned or complained of any situation related to discrimination. (D. Exhibit N).

88.  In 2010, Plaintiff received a score of "6" in his performance evaluation at Ortho-Manatí. A "6" means "performance consistently complies and frequently exceeds the standards of the position." (D. Exhibit A P.173, L.17-25; P.174, L.1-10).

Discrimination Due to Religion

89.  With respect to Irizarry, the only allegations related to discrimination due to religion were the alleged events of 1996 and 1997. (D. Exhibit A P.180, L.9-15).

90.  Seven years later, in 2004 or 2005, Plaintiff asked Johnny Muñoz, his supervisor at Janssen-Gurabo, to be transferred to the first shift in order to work more than 34 regular hours and complete 40 regular hours. This request was not granted, and Plaintiff alleges that it must have been due to his religion. (D. Exhibit A P.221, L.14-25; P.222, L.1-6).

91.  With respect to José Hernández, the allegations of discrimination due to religion were based on two events: a) in 1999 when José Hernández allegedly wrote some Bible verses in a blackboard, and b) eight years later, in 2007, when Plaintiff alleged that José Hernández created a hostile work environment for him. Plaintiff does not know how many times in 2007 José Hernández allegedly incurred actions that created a hostile work environment. (D. Exhibit A P.180, L.16-20; P.183, L.20-25; P.184, L.1-9; P.185, L.1-8; P.186, L.15-18; P.187, L.17-25; P.188, L.1-10.

92.   Plaintiff does not recall whether José Hernández made any discriminatory comments during 2007 or 2008, when he supervised Plaintiff. (D. Exhibit A P.187, L.10-12).

93.   In relation to Pantoja, Plaintiff bases his religious discrimination claim on the comments allegedly made by Pantoja in 2002 or 2003, and regarding the denial of Process Technician I and Tooling Technician positions seven or eight years later, in the Summer of 2010. (D. Exhibit A P.188, L.18-24; P.189, L.8-16).

94.   Plaintiff was not present when the decision was made to select the candidate for the Process Technician I position, nor does he know who selected the final candidate, but believes it is usually the person who interviews the candidates. (Exhibit A P.80, l. 1-9; p. 189, L.22-25).

95.   Pagán interviewed Plaintiff for the position of Tooling Technician I. (D. Exhibit A P.195, L.12-13).

96.   Pagán's expertise in interviewing is respected by his superiors. (P. Exhibit 5, P. 36, L.18-22, P. 41, L. 10-13).

97.   Plaintiff's allegation that Pantoja had influence over the hiring decision for the Tooling Technician I position is based on his inference that supervisors tell each other everything, and that Pantoja must have said something to Pagán. (D. Exhibit A P.194, L.21-25; P.195, L.1-4).

98.  Pagán asked interviewed candidates if they could work on Saturdays and Valentín was the only one who stated he was not available. (P. Exhibit 5, P. 57, L.20-25, P. 58, L. 19).

99.  Pagán and Pantoja did not consider previous performance evaluations of the interviewees and did not ask for any references.  (P. Exhibit 5, P. 47, L.18-25, P. 51,L. 18-24; P. Exhibit 3, P. 27, L. 2-19).

100.  Ojeda stated that the investigation into the recruitment process for Process Technician I showed that persons of the same experience or with less experience that Valentín were hired for the position. (P. Exhibit 4, P. 30, L. 22-25, P. 97, L. 14-17).

101.  Pagán allegedly told Plaintiff "I can't believe, I can't believe, the dog returns to its vomit" when Plaintiff arrived at Janssen-Gurabo in January 2011. (D. Exhibit A P.195, L.12-15; P.206, L. 6-10; P. 215, L. 2-15).

102.  Plaintiff does not know whether the comment "the dog returns to its vomit" is from the Book of Proverbs, he just knows its "biblical." (D. Exhibit A P.211, L.13-16).

103.  When Pagán said to Plaintiff the comment about "the dog returns to its vomit," Plaintiff responded that "no one is a prophet in his own land," which is another verse from the Bible. (D. Exhibit A P.211, L.19-25; P.212, L.1-8).

104.  Plaintiff did not know that Pagán was also an Adventist. (D. Exhibit A P.212, L.9-11).

105.   Plaintiff alleges that Torres, Director of Human Resources at Ortho-Manatí, discriminated against him because: a) she had knowledge of the alleged incident which transpired between Plaintiff and Irizarry in 1996, b) she had knowledge of the incident around 1998 where José Hernández wrote some Bible verses in a blackboard, and José Hernández was removed as Plaintiff's supervisor, and c) despite the 1998 incident, José Hernández was reassigned as Plaintiff's supervisor in 2007, nine years later. (D. Exhibit A P.196, L.14-16; P.197, L.6-15).

106.   Plaintiff alleges that the reasons for his allegation of a hostile work environment were that when he arrived at Janssen-Gurabo, he was in the third shift from January 10 to January 17, and that Ojeda had not made clear Plaintiff's schedule/shift restrictions when he arrived at Janssen-Gurabo in January 2011. (D. Exhibit A P.204, L.15-25).

107.   Plaintiff does not base his claim of religious discrimination on his allegation that he was not paid an additional amount for mileage expenses after he began to work in the Process Technician II position in Janssen-Gurabo, but rather, that it was part of the general oppression he suffered. (D. Exhibit A P.199, L.10-17).

The January 2011 Investigation

108.   After Plaintiff's exchange with Pagán regarding the comment about the dog returning to its vomit, Plaintiff went to the Human Resources Department

and met with Blanca Hernández, Human Resources Manager at Janssen-Gurabo. (D. Exhibit A P.215, L.8-12.)

109. Blanca Hernández conducted an investigation, and later met with Pagán and Plaintiff. (D. Exhibit A P.215, L.13-24.)

110. During the meeting that Plaintiff had with Pagán and Blanca Hernández in Janssen-Gurabo, Plaintiff apologized to Pagán about the whole incident and said that he had not wanted to start at the Company this way. Plaintiff said to Pagán that he was sorry for any inconvenience he had caused him. (D. Exhibit A P.247, L.16-22; P.249, L.21-25; D. Exhibit O).

111. During the meeting with Plaintiff, Pagán said to Plaintiff that he never did anything to avoid Plaintiff's coming to work at Janssen-Gurabo and, that if he failed at something, was at not listening to Plaintiff and his problems with his sick daughter. (D. Exhibit A P.250, L.11-16; D. Exhibit O).

112. When the meeting between Plaintiff, Pagán and Hernández concluded, Pagán and Plaintiff shook hands. (D. Exhibit A P.251, L.22-23).

113. During that meeting, Plaintiff spoke about his daughter and her delicate health condition. (D. Exhibit A P.217, L.22-25; P.218, L.1-2.). He does not recall saying anything else. (D. Exhibit A P.218, L.3-6).

114. After this meeting, Plaintiff never saw Pagán again. (D. Exhibit A P.219, L.1-3).

115.  Pagán never supervised Plaintiff directly, and never evaluated Plaintiff. (D. Exhibit A P.219, L.5-10).

116.  Pagán, who is also an Adventist, acknowledges that he has to solicit volunteers to work Saturdays, but that does not mean he has to supervise them that day.  His church does not prohibit him from following company's orders requiring other employees to work on Saturdays.  (P. Exhibit 5, P. 68, L. 5-25).

117.  Human Resources offered Pagán a "facilitation" process of around two hours in which several subjects of discrimination were discussed including equal employee, and sexual harassment.  (P. Exhibit 5, P. 71, L. 8-17).

118.  During this meeting, Plaintiff stated that the Hotline complaint in September 2010 was a strategy to secure his job within Johnson & Johnson. (D. Exhibit O, p. 430).

119.  Plaintiff alleges that there was retaliation against him based on his complaints in the Human Resources Department with Ojeda and Torres, as well as the Hotline complaint in September 2010.  (D. Exhibit A, P.227, L.5-8).

120.  Nobody made any comments to Plaintiff concerning his Hotline complaint. (D. Exhibit A P.236, L.3-5, L.19-21).

121.  Plaintiff alleges that in January 2011, during his first week at Janssen-Gurabo, certain supervisors in the cafeteria were talking about him

("cuchicheando"), but he does not know what they were saying. (D. Exhibit A P.237, L.1-6, 14-25).

122.   Plaintiff does not know who made the decision to transfer him to the first shift at the Packaging Department at Janssen-Gurabo. (D. Exhibit A P.233, L.13-15).

The Transfer to the Packaging Department

123.   In November, 2010, Plaintiff's psychiatrist. Dr. Parra, indicated that Plaintiff did not have a psychiatric disability at the time of his evaluation. (D. Exhibit F).

124.   Plaintiff's psychiatrist indicated that he was recently released from the hospital and recommended "[a] reasonable accommodation of maintaining the same previous shift is recommended in order to continue with the treatment schedule which was recently initiated." (D. Exhibit F).

125.   The restriction set forth by Plaintiff's psychiatrist was a restriction concerning the shift, not a restriction concerning the work area. (D. Exhibit A P.243, 1-3).

126.   When Plaintiff arrived at Janssen-Gurabo, he made a request for an accommodation, and such accommodation was granted by assigning him to the first shift from 6:00 a.m. to 2:30 p.m. in order for him to attend to his current medical situation. (Exhibit D, P.54, L.13-18).

127.   In order for Plaintiff to be in the first shift mentioned above, he was assigned to the Packaging Area. (D. Exhibit D P.61, L.22-25; P.62, L.1-10).

128.   Ojeda discussed Plaintiff's concern over being moved to the Packaging Department, and he was told that the transfer to the Packaging Department was temporary while his doctor gave him a release, and while things cooled down with Pagán; Plaintiff would then be moved to the Operations area. (D. Exhibit D P.66, L.7-26; P.67, L.5-11; D. Exhibit A, p. 242,L.6-10, P.243, L.11-15; P.246, L.11-16).

129.   Upon transferring, Valentín signed a form indicating he could lose his disability benefits or be subject to disciplinary action.  (P. Exhibit 1)

<u>Transfer to the Packaging Department</u>

130.   Plaintiff does not know if Muñoz had knowledge of his Hotline Complaint. (D. Exhibit A, P.238, L.7-11).

131.   Aside from Muñoz, Plaintiff alleges that "management" retaliated against him. (D. Exhibit A P.238, L.12-17).

132.   Plaintiff considers his transfer to the Packaging Department a demotion. (D. Exhibit A P.239, L.5-8).

<u>Plaintiff's Short Term and Long Term Disability, and Exit from Work.</u>

133.   In March, 2011, Valentín had an emotional relapse, and was once again hospitalized at First Hospital Panamericano.  (P. Exhibit 7).

134.   Plaintiff's last day at work was on March 8, 2011, after which he began a disability leave. (D. Exhibit A P.164, L.19-24; P. 166, L.5-10).

135. At Hospital Panamericano, Plaintiff stated the following factors as his reasons for seeking help: labor issues, the transfer to the Packaging Department, his father was in intensive care, apparently dying, and his daughter was sick in the United States mainland. (P. Exhibit 7).

136. On May 2, 2011, after a partial hospitalization, Hospital Panamericano referred Valentín to Dr. Erika Molina. (P. Exhibit 8, P. 23, L. 20-24).

137. Among the stressors that Valentín reported to Dr. Molina that affected his health situation were: separation from his wife in July 2010 and subsequent divorce in January 2011; his father had Alzheimer's disease and was in intensive care; his daughter was living in Boston due to a medical condition; problems with his documentation for his short term disability benefits; conflicts with peers and supervisors, discrimination and harassment. (P. Exhibit 8, P. 31, L. 2-24, P. 32, L. 1-7).

138. Dr. Molina identified as acute stressors family and labor conflicts. (P. Exhibit 8, P. 35, L. 9-13).

139. On a scale of 1 to 5, with 5 being the highest, Dr. Molina classified Plaintiff's concern about his employment situation with his peers and supervisor, as a 4 out of 5 when she first saw him; after 19 visits, she classified her concern as a 0 out of 5. (P. Exhibit 8, P. 38, L. 19-25, P. 39, L. 1-8; D. Exhibit A to Docket No. 44, P. 112, L. 8-17).

140.    Plaintiff remained on leave from March until September 2011, when he began Long Term Disability benefits. (D. Exhibit A P.165, L.10-25; P.166, L.1-25).

141.    In June 2011, Plaintiff began receiving Social Security benefits. (D. Exhibit A P.167, L.11-18; P.169, L.1-4).

Impermissible Joinder of Parties

142.    While all Defendants share the same Human Resources department, Janssen-Gurabo was the entity at which Plaintiff applied for employment, specifically for the positions of Tooling Technician and Process Technician I during the Summer of 2010, and which Plaintiff complained about to Ojeda and to the Hotline after he did not obtain the above mentioned positions. Janssen-Gurabo was also Plaintiff's employer at all relevant times after Plaintiff began his employment there in January 2011 as Process Technician I. (D. Exhibit A P.65, L.7-14; P.203, L.20-25; P.204, L.1-14; P.166, L.5-10).

**LEGAL ANALYSIS**

I.    **ADA.**

    a.    **Qualified Individual**.

The ADA "prohibit[s] discrimination against an otherwise qualified individual based on his or her disability." 42 U.S.C. § 12112(a); see Calero-Cerezo v. U.S. Department of Justice, 355 F.3d 6, 19-20 (1st Cir. 2004). To establish a claim under the ADA, Plaintiff must bring forth facts showing that: (1) he was a disabled individual within the meaning of the ADA; (2) he was qualified to perform the essential functions of the job, either with or

Yamil Valentín González v. Johnson and Johnson Services, Inc., et al
Civil No. 12-1159 (CVR)
Opinion and Order
Page 30

without reasonable accommodations; and (3) Defendants took adverse action against him because of his disability.  Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002).

The ADA defines disability as: (a) a physical or mental impairment that substantially limits one or more major life activities; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102. "Impairment", on the other hand, is defined by the EEOC as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." See 29 C.F.R. § 1630.2(h) (1991).  Major life activities are "basic activities of daily life that an average person in the general population can perform with little or no difficulty." 29 C.F.R. § 1630.2(I). These include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working ." Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011).

Applying this legal framework to the particulars of this case, the Court finds that Plaintiff has not established that he had a disability under the meaning of the ADA. In assessing whether someone is disabled according to the ADA, the Court must make an individualized inquiry. See Ramos-Echevarría, 659 F.3d at 187.  In November, 2010,

Plaintiff was diagnosed by Dr. Parra with a major depressive affective disorder with a diagnostic code of 296.23.  See D. Exh F.  This diagnostic code used by Dr. Parra is defined as a "major depressive affective disorder, single episode, severe without mention of psychotic behavior."[1]  Even though a diagnosis of a mental disorder has been found to comprise an impairment, according to the above cited statute in some instances, the diagnosis in this case at that time was that of an isolated, one time event.  It is doubtful that a one time event can be qualified as a "disability",  as that term of art operates within the statute.

Moreover, although it is evident from the evidence before the Court that Plaintiff had a mental condition, that by itself is insufficient to prove a disability as defined by the statutes under which he seeks relief. "What is required is evidence showing that the impairment limits this particular plaintiff to a substantial extent." Ramos-Echevarría, 659 F.3d at 187; see also Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir.1995) ("A physical [or mental] impairment, standing alone, is not necessarily a disability as contemplated by the ADA," this impairment must substantially limit a major life activity); Muller v. Automobile Club of Southern California, 897 F.Supp. 1289, 1297 (S.D.Cal.1995) (plaintiff's psychological problems alone, absent some showing that the problem substantially limited her major life activities, does not qualify plaintiff as disabled under the ADA).

---

[1] See www.findacode.com and www.mdhealthresource.com

Simply put, Courts require the Plaintiff to specify the major life activity in which he claims to be substantially limited and Plaintiff has failed to do so in this case. Ramos-Echevarría, 659 F.3d at 188. "The need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA." Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 152 (2d Cir. 1998).

Further compounding this problem is that Plaintiff has failed to state whether the impairment, in fact, substantially limits the major life activity he has failed to identify. This should be enough grounds to find that Plaintiff has failed to meet the first prong.

However, for purposes of this analysis, the Court will assume the major life activity affected by Plaintiff's impairment is his work. Even making this assumption, Plaintiff's claims do not amount to being disabled under the statute. The fact that Plaintiff was declared disabled by the Social Security Administration in June, 2011 has no bearing as to whether he was suffering from an impairment at the time the events of November, 2010 took place, which is when Defendants were first put on notice about the possible existence of a problem. And even then, Dr. Parra, his own psychiatrist, stated he had no disability and he could return to work immediately with a recommendation for a day shift accommodation. Dr. Parra's succinct letter certainly seems to belie the fact that Plaintiff was disabled, and further, that some major life activity was affected.

Therefore, since Plaintiff has been unable to meet the first prong of the analysis, that he was he was a disabled individual within the meaning of the ADA, his claim cannot lie.

Assuming he had met this burden, however, the Court finds his claim would also fail at the third prong, since it finds no showing of adverse action by Defendant due to the alleged disability.

It is uncontested that, as stated above, Dr. Parra stated Plaintiff suffered from no psychiatric disability, and that he could return to work immediately after his October 2010 hospitalization with the accommodation stated above, which was granted at that time, and again in January 2011. After that, Plaintiff was again taken ill in March, 2011, after which he was granted long term disability and did not return to work.

The record is clear in that Defendants complied with both requests for accommodation to a day shift position, as will be more fully explained below in the failure to accommodate analysis. It is difficult to see how any adverse action occurred when Plaintiff was granted precisely what he sought, namely, a day shift accommodation.

### b.   **Failure to Accommodate**.

The First Circuit has noted that "[t]he federal statutes barring discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee." Calero-Cerezo, 355 F.3d at 19-20. Disability discrimination under the ADA is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); see Reed v. LePage Bakeries,

Inc., 244 F.3d 254, 257 (1st Cir. 2001); Maldonado-Ortiz v. Lexus de San Juan, 775 F.Supp.2d 389, 407 (D.P.R. 2011).

To prevail on a reasonable accommodation claim under the ADA, a plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) that he was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) that, despite his employer's knowledge of his disability, the employer did not offer a reasonable accommodation for the disability. Calero-Cerezo, 355 F.3d at 20; Torres-Almán v. Verizon Wireless P.R., Inc., 522 F.Supp.2d 367, 385 (D.P.R. 2007),

The Court has already discussed that Plaintiff failed to meet the disability prong, therefore effectively barring this claim as well.  Assuming *arguendo*, however, that such a showing of a disability could be made, and assuming only for purposes of this discussion that Dr. Parra's letter constituted some sort of notice of a "disability" within the meaning of the ADA, Plaintiff would still fail the third prong, to wit, that Janssen failed to provide him with a reasonable accommodation.

Under the ADA, the term "reasonable accommodation" may include, inter alia, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).  This list notwithstanding, "[t]he use of the word 'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not required to

accommodate an employee in any manner in which that employee desires." Lewis v. Zilog, Inc., 908 F.Supp. 931, 947 (N.D.Ga. 1995). Courts have found that the word "reasonable" would be rendered superfluous in the ADA if employers were required in every instance to provide employees "the maximum accommodation or every conceivable accommodation possible." Lewis, 908 F.Supp. at 947; see also Vande Zande v. State of Wis. Dept. of Admin., 851 F.Supp. 353, 360 (W.D.Wis.1994) ("an employee is entitled only to a reasonable accommodation and not to [a] preferred accommodation"), aff'd, 44 F.3d 538 (7th Cir. 1995). Therefore, it s clear that under the ADA a qualified individual with a disability is "not entitled to the accommodation of her choice, but only to a reasonable accommodation." Lewis, 908 F.Supp. at 948.

It is uncontested that when Plaintiff returned to Janssen in November 12, 2010, Dr. Parra recommended that "a reasonable accommodation of maintaining the same previous shift is recommended in order to continue with the treatment schedule which was recently initiated". See D. Exhibit F. Defendants complied by keeping Plaintiff working during the first shift.

At this point, the investigation regarding the denial of the two vacancies had been completed and Defendants realized that Plaintiff was qualified for one of the two positions that had been denied to him, Process Technician I, and that an individual with equal or less experience than him had been hired. On December 17, 2010, Defendants offered such a position to Plaintiff, which he accepted, but under protest that his seniority would be affected. The Court notes that the offer letter states that the position offered was for the

third shift.   Therefore, even though Plaintiff somehow argues (without explaining) that accepting this position affected his seniority, Plaintiff still undeniably accepted a position which he knew he would have to request an accommodation for.  Again Plaintiff requested an accommodation, and again Defendants complied.

Yet, in spite of Plaintiff having accepted a position where he knew he would have to work against the instructions of his doctors, there was availability for a temporary transfer to the Packaging Department for the shift Plaintiff sought-the first one.  This transfer complied with Dr. Parra's request insofar as it was a daytime shift, because Dr. Parra's recommendation did not impose limitations as to the type of work that Plaintiff could or could not perform.  This transfer also served the additional purpose of allowing Plaintiff to be in a different area than his supervisor Pagán, who has uttered the "dog vomit" commentary when he returned to Janssen-Gurabo in January 2011.  Although Plaintiff argues this transfer was a demotion, he has failed to put the Court in a position to rule in his favor on this matter and the fact that his salary and benefits remained unchanged do nothing to help his case.

Thus, within a span of two months, Defendants twice accommodated Plaintiff's requests so he could fulfill his medical treatment.  On these facts, the Court cannot find that Defendants failed to accommodate Plaintiff.

Accordingly, Plaintiff's claims under the ADA are DISMISSED WITH PREJUDICE.

## II.   Retaliation.

Plaintiff also alleges he was retaliated against for making an internal complaint to Human Resources and through the company's hotline in September 2010 because he was not hired for the two vacant positions.  Then, once hired, Plaintiff complained about the failure to accommodate.  A few weeks after that, and over four months after the September complaints, Plaintiff was transferred to the Packaging department.

Title VII makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice. 42 U.S.C. § 2000e–3(a).  Retaliatory claims based on circumstantial evidence like this one are evaluated using the traditional *McDonnell Douglas* burden-shifting framework.  Gerald v. University of P.R., 707 F.3d 7, 24 (1st Cir, 2013).  To make a *prima facie* showing of retaliation, the plaintiff must show that he engaged in protected conduct, that he suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action. Id.  The burden then shifts to Janssen to proffer its legitimate, non-discriminatory reason.  Alvarado v. Donahoe, 687 F.3d 453, 458 (1st Cir.2012).

In University of Texas Southwestern Medical Center v. Nassar, ___ U.S. ___, 133 S.Ct. 2517 (2013) the Supreme Court held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." It rejected the less stringent standard used up to that point, which up to then required that a plaintiff simply show that retaliation was a "motivating" factor.  Therefore,

in the present case, Plaintiff has the burden of proving that "but for" his protected conduct of complaining, he would not have been subject to the alleged adverse employment actions. On this record, the Court finds this stricter, but-for standard, has not been met.

Again, the Court finds that the *prima facie* case burden has not been met, insofar as no causal connection can be established between the protected activity and the action. As previously discussed, in September of 2010, Plaintiff complained of not being selected for the Process Technician I and the Tooling Technician positions offered during the Summer of 2010. After completing the investigation, Defendants concluded that a candidate with equal or less experience than Plaintiff was selected for the position of Process Technician I, and that a candidate more qualified in Tool and Die making direct experience had been selected for the Tooling Technician position. Another Process Technician I position became available shortly thereafter and it was offered to Plaintiff. And, once notified about Plaintiff's complaint regarding the selection for the Process Technician I position, Defendants took corrective measures and offered Plaintiff the position, with a subsequent promotion within two months. The Court agrees with Defendants that they cannot be penalized for having heard and investigated Plaintiff's claims, and for taking what they deemed to be the corrective steps to remedy Plaintiff's claims.

Four months elapsed between the time Plaintiff presented his grievance to Human Resources and the hotline and the transfer to Packaging. This is too much time to establish that they were causally related. See Centro Médico del Turabo v. Feliciano de Melecio, 406 F.3d 1, 10 (1st Cir.2005) (explaining that while disciplinary action after engaging in

protected conduct is indirect proof of a causal connection, the causal connection disappears in the lapse of time);  Bishop v. Bell Atlantic, 299 F.3d 53 (1st Cir.2002) (if temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be "very close"); and Calero-Cerezo, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

Furthermore,  the temporal nexus that Plaintiff alleges that shows discriminatory intent between the grievance regarding the third shift in January and the transfer to Packaging occurred *precisely because* of Plaintiff's request for an accommodation.

The Court cannot find either that Plaintiff's claims that the transfer to Packaging was in retaliation for complaining about the fact that he was assigned to the third shift (again, this notwithstanding the fact that the offer Defendants made was, in fact, for the third shift).  Even assuming that Plaintiff had made a *prima facie* case of retaliation, the Court finds that Defendants have amply met their burden to establish a "legitimate, non-retaliatory" reason for the termination: Plaintiff's own request to transfer to the first shift in order to continue his medical treatment.  Therefore, the burden now rests with Plaintiff to show that this proffered reason was mere pretext, and the Court finds he has not met it.

For Plaintiff to simply "impugn the veracity" of the employer's proffered reason is insufficient; instead, he must proffer specific facts that would enable a reasonable fact finder to conclude that the employer's reason for their actions was a "sham" intended to

cover up the employer's true motive.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir.1991).  Plaintiff falls short of this threshold.

On the record as it stands, Plaintiff was granted every accommodation he requested, plus the Process Technician job he requested. That Plaintiff did not get the position he wanted instead of getting sent to Packaging is irrelevant if his request to the day shift was granted and his benefits and salary remained unchanged.  See  Hankins v. The Gap, Inc., 84 F.3d 797, 800-1 (6th Cir.1996) ("an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.").

Additionally, besides Plaintiff's self serving word, Plaintiff has proffered no evidence to establish how the Packaging position was allegedly inferior to the position that he had before.  This accommodation was granted to Plaintiff because he specifically requested it, and even so, Plaintiff cries foul.  The accommodation was granted even when Plaintiff's own physician affirmed he had no psychiatric disability and still, Plaintiff complains.  In fact, not only did Defendants offer Plaintiff the position he had previously sought, they went further and conditioned that offer on a promotion to the position of Process Technician II within two months and with a higher salary.

On these facts, the Court cannot find that Janssen's actions were a "sham" intended to cover up discriminatory motives and that the assignment to Packaging was because of his protected conduct.

As such, the cause of action for retaliation is therefore DISMISSED WITH PREJUDICE.

### III.   **Religious Discrimination**.

In order for this claim to prosper, Plaintiff must demonstrate that an adverse employment decision was the result of unlawful discrimination.  Mulero-Rodríguez v. Pontez, 98 F.3d 670, 673 (1st Cir. 1996).  In that all too familiar analysis that closely resembles the ones previously discussed in this Opinion and Order, Plaintiff must  show that he: (1) was a member of a protected class, (2) met the employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was replaced by someone with similar skills and qualifications. Id. Then, Defendants must articulate a "legitimate, non-discriminatory reason" for the adverse action taken against the employee, which if successful, requires Plaintiff to demonstrate pretext in Defendants' reasoning for the action undertaken.

For starters, the Court will not consider any comments made while Plaintiff worked at McNeill Dorado, which has ceased operations in 2000 and is not a party to this case. Defendants herein are different companies and cannot be held accountable for what happened at McNeill, and even worse, for events that transpired over fifteen years ago.

For the sake of brevity and in order not to repeat itself, the Court finds, just like in the previous claims analyzed and for the same reasons herein stated, that there is a lack of an adverse employment action for this claim.  Yet, the Court adds that although Plaintiff proffers that Defendants have "a history" of discriminatory remarks directed at Plaintiff, it is uncontested that Plaintiff sought, and received, the various transfers he requested throughout his time at Janssen and further, and that he received favorable evaluations and

Yamil Valentín González v. Johnson and Johnson Services, Inc., et al
Civil No. 12-1159 (CVR)
Opinion and Order
Page 42

awards throughout his time there as well. Furthermore, as previously discussed, Plaintiff's requests for accommodation were granted and he never worked on the Sabbath. Therefore, at first glance, the remarks in question cannot be said to have had any adverse, discriminatory effect on his job prospects.

The Court therefore delves directly into the pretext issue. The Court finds most of the remarks in question are simply too removed and remote to have had any effect on the Summer 2010 job prospects.[2]  Comments uttered from 2002-2005 are simply not close enough in time to establish that discriminatory animus was involved in the denial of the summer 2010 positions. Although the Court has examined them so as to have background to Plaintiff's claims, it finds that at most, they were stray remarks in the workplace that do not fall under the discrimination rubric.  See Ortiz-Rivera v. Astra Zeneca LP, 596 F.Supp.2d 231, 246 (D.P.R. 2009) (stray remarks, standing alone, are normally insufficient to establish either pretext or discriminatory animus); McMillan v. Massachusetts Soc'y for Prev. of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998) (while " stray remarks' may be material to the pretext inquiry, "their probativeness is circumscribed if they were made

---

[2]  See, e.g., Kirk v. Hitchcock Clinic, 261 F.3d 75, 78 (1st Cir.2001) (finding that employer's 1996 remarks, made in connection with earlier time-barred discriminatory decision, were not "direct evidence" relevant to a 1997 employment decision); Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3d Cir. 1994) (finding remarks "too remote in time" to constitute "direct evidence"); Oest v. Ill. Dep't of Corr., 240 F.3d 605, 611 (7th Cir. 2001) (noting that "temporal proximity is often crucial to the [direct-evidence] inquiry," and that two-year lapse between remark and employment decision "defeat[s] the inference of a 'causal nexus between the remark and decision to discharge' ") (citations omitted); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1089 (7th Cir. 2000) (same, remarks "two years prior to [employee's] discharge"); Yates v. Douglas, 255 F.3d 546, 549 (8th Cir. 2001) (same, remarks "one to two years" before termination); Scott v. Suncoast Beverage Sales Ltd., PMBA, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (same, remarks "two and one-half years before the termination").

in a situation temporally remote from the date of the employment decision, or were not related to the employment decision in question"). In the case at bar, comments made at the latest five years before the events in question are too remote to have any effect on the decisions made by Defendants in 2010.

Although closer in time, the comment about the "dog returning to its vomit" also falls into the category of stray remark. It is undisputed that Plaintiff does not know who made the hirings for the Summer 2010 positions, and further, that the person who made the comment, Gilberto Pagán, was not the person who transferred him to the Packaging department. In fact, Plaintiff candidly admits he does not know who, in fact, made the decision to transfer him or who made the ultimate decisions to deny him the two positions in the Summer of 2010. Additionally, the fact that Pagán, like Plaintiff, is also an Adventist, weighs heavily against a discriminatory finding here. Though the comment may be considered an unprofessional one, it lacks a discriminatory animus on the facts alleged.

This brings the Court to the job openings in the Summer of 2010. Although the two positions were initially denied to Plaintiff, Defendants later offered the Process Technician I position to Plaintiff beginning in January 2011, and a promotion to Process Technician II two months later in March 2011. Even making all inferences in Plaintiff's favor, no animus can possibly be seen on behalf of an employer who actually offered an employee the specific job he asked for after being shown that the employer made a mistake in the initial refusal, and when that offer was made with the promise for a promotion and a higher salary barely two months into the job.

Regarding possible animus in the transfer to Packaging, even assuming Plaintiff had established a *prima facie* case, his claims would fail for the same reason his other claims fail, namely, Defendants have offered a legitimate, non discriminatory reason for this action.  The fact that Plaintiff specifically asked for this accommodation further serves to undermine his position.  And, as discussed above, Defendants have no obligation to give Plaintiff the accommodation he sought but only a reasonable one, as they did.

Plaintiff counters with the fact that he requested a transfer out of Packaging and no answer was ever given.  However, Plaintiff omits to mention that: 1) the transfer to Packaging was temporary, and 2) he had already been granted a promotion Process Technician II to go into effect barely a month and a half after the transfer to Packaging was granted.  Indeed, this promotion never materialized as Plaintiff took medical leave in March 2011 and never returned to work.

Finally, even if Plaintiff sought to prove that Defendants' actions were pretextual, Plaintiff cannot show that discriminatory comments were made by the key decision makers or by those in a position to influence the decision maker, since it is uncontested that Plaintiff does not know who made the decision not to hire him for the positions he sought in the Summer of 2010, or who made the decision to transfer him to Packaging. See Ayala-Gerena v. Bristol-Myers-Squibb Co., 95 F.3d at 86, 96 (1st Cir. 1996) ("...direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decision-makers unrelated to the decisional

process itself.") and <u>McMillan</u>, 140 F.3d at 301 (probativeness of stray remarks circumscribed if they were made by non-decision makers).

On this record, the Court cannot find that discrimination on the basis of religion occurred.  As such, Plaintiff's claims for religious discrimination are DISMISSED WITH PREJUDICE.

### IV.   State Law Claims.

Plaintiff also filed claims under the Puerto Rico law counterparts to the federal claims, as well as for damages under Puerto Rico law.  When federal claims are dismissed before trial, state claims should be dismissed as well, but such is not a mandatory rule to be applied inflexibly in all cases.  Rather, the court should exercise informed discretion when deciding to assert supplemental jurisdiction over state law claims.  <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614 (1988); <u>Rosado v. Wyman</u>, 397 U.S. 397, 403-05, 90 S.Ct. 1207 (1970); <u>Roche v. John Hancock Mutual Life Ins. Co.</u>, 81 F.3d 249, 256-57 (1st Cir. 1996).

Since no federal claims remain viable as above discussed, the Court declines to exercise jurisdiction as to the pendent state claims filed against all Defendants.  Thus, the state claims are DISMISSED WITHOUT PREJUDICE.[3]

---

[3]Insofar as all of Plaintiff's claims are dismissed, the Court does not reach the issue of the impermissibly joined parties, Johnson and Johnson Business Services and Janssen Cilag Mfg., LLC.  The claims against them are dismissed as well, with prejudice.

Yamil Valentín González v. Johnson and Johnson Services, Inc., et al
Civil No. 12-1159 (CVR)
Opinion and Order
Page 46

## CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment (Docket No. 28) is GRANTED. All federal claims filed against all Defendants are DISMISSED WITH PREJUDICE. All state claims filed against all Defendants are DISMISSED WITHOUT PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 28th day of May, 2015.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE